MEMORANDUM OF DECISION
On November 12, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Blanca L. and Santos P. to their daughter, Amneris P. Blanca L. also filed a motion for revocation of the commitment of her child, which was consolidated with the termination petition for trial. The trial was held on January 4, 5, and 6, 2000. Blanca L. attended the trial. Santos P. has not been involved with his daughter for many years and left the state of Connecticut in 1993. He did not attend the trial, nor was counsel appointed to represent him. For the reasons stated below, the court denies the motion for revocation of commitment and the court grants the petition for termination of the parental rights of Blanca L. because of her failure to rehabilitate herself as a parent to this child and because there is no longer an ongoing parent-child relationship with her child. The court also grants the petition as against Santos P. on the grounds of abandonment. Connecticut General Statutes § 17a-112(c)(3)(A), (B) and (D).
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Blanca L, the mother.
Amneris is the third child born to her mother.[2] Blanca was sixteen when her oldest daughter, Janice R. was born, eighteen when her son, Alex P. was born and nineteen at the time of Amneris's birth. Blanca is one of eight siblings herself and CT Page 1701 received a serious brain injury when she was a child, which left her with a seizure disorder. Whatever the source of her impairment may be, Blanca is noted by all observers to be somewhat limited. DCF first became involved when Blanca's mother, the child's grandmother, brought Janice R. to the hospital in December, 1992, voicing concerns that the child was sexually abused by Santos P. Blanca at that time did not believe the allegations and refused to take action. DCF thereafter provided protective services to the family, noting drug abuse and domestic violence. When the children were in Blanca's care in 1992 and 1993, DCF stated in its treatment plan of September 2, 1993 that "She is very overwhelmed, appears to be limited and has poor judgement."[3]
Amneris, herself, was brought to the hospital by her mother in February, 1993. Amneris, she reported, had a lump on her head and had been vomiting for two weeks. Upon examination, it was discovered that Amneris had a skull fracture and Blanca's explanation for how this had happened was very vague. Although Amneris was returned to her mother's care after her hospitalization, the situation in the family deteriorated during the course of that year. By October 1993, Blanca was unable to care for her children. Janice, the oldest, was with her grandmother. Alex, the middle child, was placed in foster care but he, like Janice, is now in the legal guardianship of his grandmother. Blanca took Amneris to her sister, Irene P., and told her she could not care for her. On October 19, 1993, Amneris was placed in the foster home where she continues to reside to the present day. Blanca entered into a voluntary placement agreement for Amneris with DCF after Irene P. called DCF and told them she also could not care for this child.
Between 1993 and 1995, Blanca was homeless on several occasions, only visited sporadically and did not take any steps to deal with her drug addiction. Santos P., the biological father, left the state of Connecticut in 1993 and never was involved with either of his two children again. On May 8, 1994, both children, Alex and Amneris, were adjudicated neglected. No expectations were set for Blanca, as she was not present in court. On October 25, 1995, upon extending Amneris's commitment, the court found that further reunification efforts between Blanca and Amneris were not appropriate. (Melville, Jr.) On December 21, 1995, DCF filed a status report indicating that they planned to file for termination of parental rights.[4]
CT Page 1702
While Blanca was offered visitation and some services in the intervening time, it was not until January, 1997 that she became committed to trying to rehabilitate herself and reunite with her daughter. As was noted by DCF, she slowly began to work towards that end. She then began regular supervised bi-weekly visitation, which she has for the most part complied with. No court expectations were set for her until November 16, 1997. Those expectations were that she was to have a neurological evaluation, which had been recommended in 1994. She was to visit regularly. She was to attend parenting and individual counseling, secure adequate housing and secure a drug evaluation. By September 28, 1998, she had not taken most of these steps.[5] On December 17, 1998, the court again found that further reunification efforts were not appropriate (Rogers, J.) However, the evidence at trial supports the conclusion that she has been apparently drug free since 1997. She has completed two parenting programs, continues in individual counseling and has completed a neurological exam. She also had then and now has housing adequate for herself and a child. The evidence, the court concludes, supports the finding that Blanca has made the beginning efforts at rehabilitation.
But attendance at programs and counseling tells only a portion of the story. When Blanca was evaluated pursuant to court order in 1994, the psychologist then found contradictory findings indicating some elements of mental retardation. She believed that her findings could be explained by Blanca's history of head injury, seizures and depression. She reported significant psychiatric symptoms at that time including "depression, anxiety, nightmares, flashbacks regarding traumatic abuse and suicidal ideation."[6] At that time, services were recommended for Blanca, which Blanca ultimately utilized, but not until three and four years later. Those recommendations were for parenting, individual therapy and a neurological evaluation, and medication. Dr. Ramsey-Edgar believed that if her children were returned, Blanca would need extensive support.
2. Amneris's rejection of her mother.
She saw Blanca and Amneris in 1998 for a parent child interaction. In 1998, she found Blanca be "less depressed than she had been before. She was more well groomed and more energetic." Nonetheless, she noted that her passivity and quietness were similar to the earlier interview in 1994. Dr. Ramsey-Edgar noted that Amneris did not seem connected to her mother and was critical and rude to her as the interview CT Page 1703 progressed. Blanca was not able to engage the child and set limits for her. Dr. Ramsey-Edgar testified that she had grave concerns about reunification, based on what she saw in the interaction and Blanca's responses in the brief interview she had with her. Amneris's reaction to her mother was not positive, she noted, and the child went out of her way to let her know that her foster mother was her mommy.
Blanca and Amneris were also evaluated by Carol Swenson, another licensed clinical psychologist. She saw them both in May, 1999. She, too, noted Blanca's significant intellectual limitations. She determined that:
 "Because of these limitations, her coping skills, her judgment and her ability to understand the importance of and utilize services that have been offered to her are compromised . . . I suspect that her passivity, her tendency simply to give up or avoid issues is her major personality difficulty and will continue to compromise her wishes and efforts to make changes in her life."
She believed that Blanca did not understand and was unable to appreciate the "difficulties in her relationship with her daughter, which would need to be addressed if [that relationship] is to be positive." When evaluating Amneris, Dr. Swenson noted that "[Amneris] is worried about being forced to live or spend significant time alone with her birth mother."
Other observers without fail also describe in detail Amneris' hostile reaction to the visits and to her biological mother. The DCF social workers noted that the interactions between Amneris and Blanca were minimal. Amneris would cry during visits, sometimes throughout the whole visit and would have a difficult time after visits and regressed in the foster home. This behavior was noted by the first social worker, who was involved with the case from 1993 to 1996 as well as the current worker. Amneris's rejection of intimacy with her biological mother has been consistent and unending.
Ms. Fontanez, a counselor with the Child Guidance Clinic, who has worked with Amneris recently, testified. Amernis was referred to her program because the child was having angry outbursts and was frustrated because of the visitation with her mother. She engages in play therapy with the child. She noted the child identified the foster family as her family and does not mention being with her biological mother. She noted that when she met CT Page 1704 with Blanca, she concluded that Blanca had very little insight into her daughter's situation. She also noted that the foster mother was Amneris's psychological parent.
Subsequent to the evaluation performed by Dr. Ramsey-Edgar, DCF referred Amneris and Blanca to a therapist to assist in supporting their visitation and addressing various issues to make visitation a positive experience for Amneris. Ms. Byrne met initially with Amneris for three sessions in June, 1998. She noted in a report to DCF that:
 "In each session, Amneris was clear about her feelings regarding visits. She stated she did not like the visits and did not wish to attend them. In the third visit, she stated that she did not want more visits and that she did not want to see Ms. L. any more."
Ms. Byrne concluded that:
 "Amneris is not benefiting from these visits and it is likely that if they are forced upon her she may begin to become symptomatic. Amneris has no desire to pursue a relationship with Ms. L. This makes the possibility of a successful reunification between mother and child nearly impossible."[7]
At trial, Ms. Byrne testified that she felt this child needed a permanency plan put in place as soon as possible. This would "enhance her feeling of security if a plan was established." She noted that the child, who was then not quite six years old, "expressed that she wanted to remain where she was and that she felt she was solidly attached for her to be moved would be a problem." After these conclusions by Ms. Byrne, DCF discontinued visitation between Blanca and her daughter, although Amneris continues to have visits with her brother, Alex, and her maternal grandmother.
The foster mother testified concerning her experience with Amneris. She stated that when Amneris came into her home, "she was very ill. She had diarrhea, she was vomiting and she did not have much movement. She did not know how to crawl and could only hold the bottle a little." She was then fourteen months old. Amneris received special services to address her developmental delays. She had physical therapy. Now, her foster mother notes, "she is doing very well physically. She is a little behind academically. She is a little girl who gets along with the whole world." Her foster mother noted that her husband died in January, CT Page 1705 1999. Amneris still misses him.
Amneris has also spoken to her foster mother about her biological mother. She stated "she does not want to go with her mother. She crosses her arms and says it is not fair that I have two mothers." For a period of time, Blanca had visitation with Amneris in the foster home. The foster mother said this happened in 1994 and when Blanca came, "most of the time I had to call [Amneris] to come and talk to her mother. She would go into the bedroom or the kitchen and would not come." The court finds, from this and other evidence, that Amneris's rejection of her mother began soon after she left her mother's care.
Blanca L. and her mother, the child's grandmother both testified. Blanca, the court finds, does not understand, why her daughter did not want to spend time with her. She could not appreciate that the length of time Amneris has been out of her care from 1993 until 1997, when she admitted she first began to work seriously towards reunification, might have been too long for Amneris. When asked about a visit in July, 1998 and whether she said anything to Amneris which made her cry, Blanca reported that: "From what I remember, I did not say anything to make her cry. I only told her that I loved her." That such a statement might be upsetting to her daughter and might call her allegiance to her foster mother into question was not something Blanca could understand. While the court finds that Blanca attended several parenting programs and completed those programs, the court also finds, as the professionals have noted, that Blanca has no insight into her daughter's needs and is not now ready to parent her.
 B. MOTION FOR REVOCATION OF COMMITMENT
Blanca has filed a motion for revocation of Amneris's commitment to DCF and argues that the original causes for that commitment no longer exist. She maintains that she has been drug free since 1997. The court has no evidence to refute this assertion and finds it commendable that Blanca was able to achieve sobriety and maintain it for a number of years. Blanca further claims that she has met all of the court's expectations and that there are simply no longer any causes for commitment of Amneris. The court does not agree.
Connecticut General Statutes § 46b-129(m) provides that:
CT Page 1706 "Any court by which a child. . . . has been committed pursuant to the provisions of the section, may, upon the application of a parent. . . . upon finding that cause for commitment no longer exists, revoke such commitment
Our case law has clearly held that:
 "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that the cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests." (Internal citations and quotations marks omitted.) In re Cesar G., 56 Conn. App. 289, 292, 293 ___ A.2d. ___ (2000).
 "The court, in determining whether cause for commitment no longer exits, would obviously look to the original cause to see whether the conduct or circumstances that resulted in commitment continue to exist . . . The trial court, thereafter, "may consider if any
cause for commitment still exists." Supra p. 294
As indicated, the court does not quarrel with the assertion that Blanca is now drug free. The court does not find, however, that she has rehabilitated herself and that no causes for commitment now exist. Further, even if the court concludes that there are no causes for commitment remaining, the court is required to consider whether or not a continuation of the commitment will nevertheless serve the child's best interest. As was stated In re Thomas L., 4 Conn. App. 56, 57, 492 A.2d 229
(1985):
 On this point, when it is the natural parents who have moved to revoke commitment, the state must prove that it would not be in the best interests of the child to be returned to his or her natural parents." (Internal citations omitted).
Given the overwhelming evidence of Amneris's rejection of her mother and her close connection to her foster mother, the court finds that it would not be in her best interests to be returned to her mother. The professionals have noted that it would be detrimental to Amneris to remove her from the foster mother and place her in the mother's care. The court so finds from the clear and convincing evidence, although only a preponderance of the evidence is required on this point in the revocation context. CT Page 1707
 C. TERMINATION PETITION AND ADJUDICATORY FINDINGS 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112(c)(1). The court made such findings on June 8, 1999. (Melville, J.) and again on December 12, 1998. (Rogers, J.) The court does find, from the clear and convincing evidence that reasonable reunification efforts had been made prior to and subsequent to the first date of these findings. Such efforts were hampered by Blanca's passivity, her cognitive limitations and the very long period of time which had elapsed from the time of the placement of her child and her decision to begin to work toward rehabilitation.
2. Adjudicatory findings
 (a) Blanca L.
On May 8, 1994, Amneris was adjudicated neglected and committed to the care and custody of DCF for a period of twelve months. Her commitment has been extended since that time. The court further finds, by clear and convincing evidence, that as of November 12, 1998, Blanca had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112(c)(3)(B).
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194,203, 504 A.2d 532 (1986), see also; In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795 (1984). The court concludes Blanca's lack of rehabilitation must be seen from Amneris's optic, for Blanca was not able to maintain a reasonable relationship with her or re-establish one. Her own testimony highlights her lack of understanding of this child's needs and CT Page 1708 her inability to resume a constructive or useful role in the child's life. Given the length of time Blanca has been receiving services and her failure to begin to understand her child, the court finds that the evidence is clear and convincing that there is no prospect that Blanca will be rehabilitated with respect to this child within the foreseeable future.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C.,210 Conn. 157, 1167, 554 A.2d 722 (1989), In re Hector L.,53 Conn. App. 359, 366-367 ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Blanca's conduct prior to the filing of this petition, but also her conduct after that time. In this case, this was a period of slightly more than one year, during which time Blanca made no progress.
The termination petition also alleges that there is no ongoing parent-child relationship between Blanca and Amneris and to allow further time for the development of such a relationship would be detrimental to the best interests of the child. Connecticut General Statutes § 17a-112(c)(3)(D). For the reasons detailed above, the court so concludes from the clear and convincing evidence.
(b) Santos P.
The court finds, by clear and convincing evidence, that as of November 12, 1998, Santos P. had abandoned his child. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). He simply was never involved in the life of this child.
 D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were provided by DCF to the CT Page 1709 family. The services include services to benefit Amneris, referrals for Blanca to deal with issues of domestic violence, parenting and substance abuse. DCF also provided visitation and case management services. Santos P. was not available to receive any services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, until the second order that further efforts were not required on December 12, 1998. While Blanca's counsel challenges that there was no therapeutic visitation support provided as was originally the plan when she and Amneris were referred to Ms. Byrne, under the circumstances of the case, the court finds what was done reasonable and consistent with the best interests of the child.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Blanca and she has minimally fulfilled them, although the behavioral and other changes which the services are meant to cause were never exhibited by Blanca in connection to Amneris. None were set for the biological father due to his absence.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child have developed significant emotional ties. In this case, the record is clear that Amneris is bonded to her foster mother and has rejected her biological mother, whom she does not wish to see. There is no ongoing parent-child relationship between them.
5) Finding regarding the age of the child. Amneris will soon be seven and one-half years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return her to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the CT Page 1710 court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of this child.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Blanca to have a meaningful relationship with her child and to rehabilitate herself, which she has been unable to accomplish
 E. DISPOSITION
The court concludes, from the clear and convincing evidence, that there is no biological parent ready now or in the foreseeable future, who will be able to care for Amneris. The court concludes, from the clear and convincing testimony, that it is in the best interests of this child to finally be permitted to have permanency and stability in her life. Towards that end, the court concludes that it is in Amneris's best interests that her parents' rights to her be terminated. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992).
Based upon the foregoing, the court finds that it is in the best interests of Amneris P. that Blanca L.'s rights to her be terminated. The court further concludes that it is in her best interests that the rights of Santos P. to her be terminated. The court therefore orders that a termination of parental rights enter with respect to Blanca L. and Santos P. The foster mother has expressed a desire to adopt Amneris and the court directs that she be given first consideration in any adoption. The court further orders that a permanency plan for Amneris be submitted within sixty days. A review plan for her shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session